Filed 4/11/13  P. v. Regalado CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GUILLERMO MARTINEZ REGALADO, SR., et al.,<br><br>    Defendants and Appellants. | D060807<br><br><br><br>(Super. Ct. No. JCF22968) |

APPEALS from judgments of the Superior Court of Imperial County, William D. Lehman, Judge.  Affirmed.


Defendants Guillermo Martinez Regalado, Sr. (Senior) and his son Guillermo Martinez Regalado, Jr. (Junior) appeal judgments following their jury convictions of first degree murder and related offenses.  On appeal, Senior contends: (1) the trial court prejudicially erred by instructing the jury it could not find him guilty of a lesser offense than Junior; (2) the prosecutor committed prejudicial misconduct; and (3) the trial court erred by not instructing sua sponte on voluntary intoxication as a defense to the two

criminal threat counts against him. In a separate appeal, Junior filed a *Wende*[1] brief, mentioning possible, but not reasonably arguable, issues as discussed below.

FACTUAL AND PROCEDURAL BACKGROUND

Senior and Junior owned a farming business. On the morning of January 5, 2009, Senior went to a farm work site intoxicated. At the work site, Senior asked Alberto Rivera, the supervisor, to lend him some workers for the day. Rivera told him to ask Javier Garcia. When Senior did so, Garcia refused and told him, "I've had it with you," pulled Senior out of his car, and punched him repeatedly in the face. Senior returned home upset and told his wife, Cecilia Amparan, he had been beaten. Amparan saw blood in his mouth and his face appeared to have been battered. Senior called Junior, and discussed the incident. Senior was afraid of Garcia and told Junior they needed to act before someone was killed. Senior continued to drink throughout the day.[2]

At 11:30 a.m., Junior purchased rifle ammunition at a sporting goods store. That afternoon, Senior apparently took an old rifle from a closet in his home and then he, Junior, and Amparan drove to a ranch, where all three engaged in target practice for about one hour.

---

[1] *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).

[2] At trial, Amparan testified Senior drank about three bottles of whiskey throughout the day. On redirect examination, Amparan admitted that shortly before trial she met with a defense investigator to discuss the issue of Senior's consumption of whiskey on the day of the incident.

At about 7:00 p.m., Amparan drove Junior's truck with Senior, Junior, and Senior's friend, Jorge Ramirez, as passengers, to an Imperial Valley agricultural field. Junior had the rifle with him. Senior and Junior told Amparan they were going to talk to Garcia. Senior, carrying a knife, and Junior, carrying the rifle, got out of the truck and walked toward a trailer in the field. Rivera, the supervisor, was standing outside the trailer, while Garcia and Marco Estrada were riding on a tractor in the field picking up boxes. Senior grabbed Rivera by the shirt, held the knife to him, and pulled him over to some haystacks near the trailer. As the tractor approached with its headlights on, Senior continued to hold the knife to Rivera. The tractor pulled up and Estrada began to drive it in reverse toward the trailer. Garcia was standing on the tractor's step to Estrada's right. Standing near the haystacks, Junior raised the rifle and fired it at Garcia from a distance of about two meters, striking him in the abdomen, and causing him to fall from the tractor. Junior walked up to Garcia, chambered another bullet, pointed the rifle less than one foot from Garcia's cheek, and shot him again. Senior then released Rivera, walked up to Garcia, cursed at him, and kicked him three or four times in the head, causing an ear to partially detach.

Junior made a call on his cell phone and said: "Okay. Come on." Within a few minutes, Amparan returned in the truck. Senior threatened to kill Rivera if he told anyone about what happened to Garcia. Senior and Junior threatened to kill Estrada if he talked. Senior and Junior forced Estrada to help them load Garcia's body onto the bed of the pickup truck. Senior, Junior, and Amparan left in the truck, drove across some fields,

3

and then dumped Garcia's body in a drainage ditch. Garcia died from two fatal gunshot wounds.[3]

After returning home, Amparan washed Senior's clothing. Shortly thereafter, Senior and Amparan drove to Bakersfield and then Kansas. Senior shaved off his mustache and stopped dying his hair. A few days after the killing, Rivera, Estrada, and Ramirez each spoke with a sheriff's investigator and gave their accounts of the incident.

On January 15, 2009, Junior was taken into custody. Junior told the sheriff's investigator that he and Amparan, but apparently not Senior, drove to the field to confront Garcia. He admitted he brought along a rifle, but denied holding it when Garcia was shot. He admitted throwing Garcia's body in the drainage ditch.

After Senior learned Junior had been arrested, he returned to El Centro. On January 17, 2009, Senior was arrested and told the sheriff's investigator that he (Senior) shot Garcia. He explained that after Garcia beat him up and threatened him the morning of January 5, 2009, he bought a rifle from a "cholo" in front of a convenience store. After practicing shooting the rifle, he went to the field and shot Garcia. Senior said he loaded Garcia's body onto the truck and later dumped the body in a canal. On returning home, he realized he still had the rifle, so he drove to Forrester Road and disposed of it. Senior insisted he was the one who shot Garcia and was responsible for everything.

---

3    At trial, the medical examiner testified the wound to Garcia's chest was fired from over two feet away and from his left. The wound to Garcia's head was fired from six to 12 inches away. Garcia's partially amputated ear could have resulted from a kick.

4

An information charged Junior with first degree murder (Pen. Code, § 187, subd. (a)),[4] and Senior with first degree murder (§ 187, subd. (a)), assault with a deadly weapon (§ 245, subd. (a)(1)), and two counts of criminal threats (§ 422). The information was later amended to add weapon-use allegations to the murder charges against Senior and Junior (§ 12022.53, subds. (b), (c), (d)). A few days before trial, Senior told Amparan in a taped jail telephone conversation to testify at trial "that she doesn't know anything."[5]

At Senior and Junior's joint trial, testimony and other evidence substantially as described above was presented. Furthermore, Rivera testified he was "sure" Senior was not intoxicated when Garcia was shot. Although Senior had a wine odor about him, Senior did not tip or lose his balance at any point during the incident or when he kicked Garcia. Senior spoke clearly and appeared to be in control of what he was doing. Estrada also testified Senior was "walking fine" when he walked up to Garcia to kick him.

The jury found Senior and Junior guilty on all counts and also found true the weapon-use allegations against Junior. The trial court sentenced Senior to 25 years to life in prison for first degree murder, plus a consecutive one-year eight-month term for his

---

[4]     All statutory references are to the Penal Code.

[5]     At trial, Amparan testified she did not remember Senior telling her that.

assault conviction, for a total term of 26 years eight months to life in prison.[6]  The court

sentenced Junior to 25 years to life in prison for first degree murder, plus a consecutive

25-year term for the weapon-use allegation, for a total term of 50 years to life in prison.

Senior and Junior timely filed notices of appeal challenging their convictions.

DISCUSSION

*SENIOR'S APPEAL*

I

*Instructions on Aider and Abettor Liability*

Senior contends the trial court prejudicially erred by instructing the jury it could

not find him, as an aider and abettor of the murder, guilty of a lesser offense than Junior,

the direct perpetrator of the murder.

A

Murder is an unlawful killing of another committed with malice aforethought.

(*People v. Cravens* (2012) 53 Cal.4th 500, 507.)  Malice may be express or implied.

(*Ibid*.)  Malice is express when the defendant intends to kill and implied when the

defendant deliberately commits an act dangerous to human life and acts with knowledge

of the danger and a conscious disregard for life.  (*Ibid*.)  First degree murder, as relevant

in this case, includes willful, deliberate, and premeditated murder and murder committed

---

6     Pursuant to section 654, the trial court stayed punishment for Senior's two criminal
threat convictions.

by lying in wait. (CALCRIM No. 521.) Absent those circumstances, a murder is second degree.

A defendant may be culpable for a crime as a direct perpetrator or as an aider and abettor. "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." (§ 31; see *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122-1123.) "Except for strict liability offenses, every crime has two components: (1) an act or omission, sometimes called the actus reus; and (2) a necessary mental state, sometimes called the mens rea. [Citations.] This principle applies to aiding and abetting liability as well as direct liability. An aider and abettor must do something *and* have a certain mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).) In general, "an aider and abettor's mental state must be at least that required of the direct perpetrator. 'To prove that a defendant is an accomplice . . . the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.] When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' " (*Id*. at p. 1118.) Therefore, an aider and abettor's criminal liability "is vicarious only in the sense that the aider and abettor is liable for another's

7

actions as well as that person's own actions." (*Ibid.*)  In contrast, an aider and abettor's

"mental state is [his or] her own; [the aider and abettor] is liable for [his or] her mens rea,

not the other person's [i.e., the direct perpetrator's mens rea]." (*Ibid.*)  Because the mens

rea of a direct perpetrator and an aider and abettor floats free from the other's mens rea,

the level of guilt of one also floats free from the other's. (*Id.* at p. 1119.)  Accordingly,

*McCoy* concluded: "If the mens rea of the aider and abettor is more culpable than the

actual perpetrator's, the aider and abettor may be guilty of a more serious crime than the

actual perpetrator." (*Id.* at p. 1120.)

In *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164 (*Samaniego*), the

court applied *McCoy*'s reasoning to conclude "an aider and abettor's guilt may also be less

than the perpetrator's, if the aider and abettor has a less culpable mental state." (See also

*People v. Nero* (2010) 181 Cal.App.4th 504, 513-518.)  An "aider and abettor may be

found guilty of *lesser* homicide-related offenses than those the actual perpetrator

committed." (*Id.* at p. 507.)  Although an aider and abettor's guilt may be lesser or

greater than the direct perpetrator's guilt, "[g]enerally, a person who is found to have

aided another person to commit a crime is 'equally guilty' of that crime." (*People v.*

*Lopez* (2011) 198 Cal.App.4th 1106, 1118.)

B

The prosecution's theory on the murder charge was that Junior was the shooter,

and thus the direct perpetrator, and Senior aided and abetted Junior in committing the

murder.  Senior's defenses to the murder charge were voluntary intoxication and

8

provocation. The trial court instructed the jury on first and second degree murder. The court also instructed on the lesser offense of voluntary manslaughter based on provocation (i.e., sudden quarrel or heat of passion) and imperfect self-defense. The court also instructed on voluntary intoxication, which the jury could consider "in deciding whether [Senior] acted with an intent to kill, or . . . with deliberation and premeditation."

The trial court instructed with CALCRIM No. 400 on aiding and abetting, stating:

> "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

The court further instructed with CALCRIM No. 401, stating:

> "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
>
> "1. The perpetrator committed the crime;
>
> "2. The defendant knew that the perpetrator intended to commit the crime;
>
> "3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND
>
> "4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
>
> "Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

9

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

On July 6, 2011, during deliberations, the jury sent a note (Note 1) to the trial court, asking: "If we decide on a charge for Jr. [and] decide Sr. aided [and] abetted[,] is Sr. guilty to the same degree?" Over Senior's objection, the trial court replied to Note 1, instructing the jury: "I would direct your attention to instructions 400 and 401. If you believe that the elements of aiding and abetting have been proven, Senior is guilty to the same degree as Junior."

On July 7, Senior filed an emergency motion to reconsider jury instructions and reinstruct the jury, citing *McCoy* and *Samaniego*. Senior argued the court's reply to Note 1 was based on a prior version of CALCRIM No. 400, which misled the jury to believe that if he aided and abetted Junior, he must be found "equally guilty" of the same crime as Junior. He argued that if the jury found he aided and abetted Junior in killing Garcia, the law allowed it to find him guilty of a lesser degree of homicide than Junior. He argued the jury should be expressly so instructed. Later that day, Senior filed an amended motion. The trial court denied his motion. The court explained it did not read any portion of CALCRIM No. 400, but merely referred the jury to CALCRIM Nos. 400 and 401, the current versions of those instructions given by the court before counsel's

10

closing arguments. It did not use the words "equally guilty." Furthermore, the court explained the jury did not ask it whether an aider and abettor may be found guilty of a lesser level of homicide than the perpetrator.

On July 8, the jury sent another note (Note 2) to the trial court, asking: "If we agree that Sr. aided [and] abetted in the commission of the crime[,] would provocation and/or intoxication be a legal defense for him (Sr.)?" The court replied to Note 2, instructing the jury: "The instructions on intoxication and provocation apply to both defendants."[7]

On July 11, the jury sent another note (Note 3) to the trial court, asking: "Does provocation only apply to the person [who] pulls the trigger?" The court believed Note 3 was a restated version of Note 2. With counsel's concurrence, the court replied to Note 3, instructing the jury: "Provocation applies equally to both the shooter and [an] aider and abettor." Less than one hour later, the jury returned its verdicts finding both Senior and Junior guilty of first degree murder.

C

Senior contends the trial court prejudicially erred in replying to the jury's notes because the court, in effect, instructed the jury that if it found he aided and abetted Junior, then it was required to find him (Senior) guilty of the same degree of homicide as Junior.

---

[7]    The trial court rejected Senior's proposal that the court instead instruct the jury: "[I]f the jury agrees that Senior aided and abetted in the commission of a crime, the instructions on provocation and intoxication still apply to Senior." The court noted its instruction was similar to the one suggested by Senior.

11

Senior argues the court therefore instructed the jury, in effect, that it could not find him, as an aider and abettor of the murder, guilty of a lesser offense than Junior, the direct perpetrator of the murder.

We conclude the trial court did not err in instructing the jury on aiding and abetting. Senior does not challenge on appeal the original instructions given the jury before its deliberations began, which included the current versions of CALCRIM Nos. 400 and 401 on aiding and abetting. Rather, he points to the court's reply to Note 1 as constituting instructional error. As discussed above, Note 1 asked: "If we decide on a charge for Jr. [and] decide Sr. aided [and] abetted[,] is Sr. guilty to the same degree?" The court replied: "I would direct your attention to instructions 400 and 401. If you believe that the elements of aiding and abetting have been proven, Senior is guilty to the same degree as Junior." Contrary to Senior's assertion, the court's reply was *not* an incorrect statement of aiding and abetting principles. Generally speaking, "a person who is found to have aided another person to commit a crime is 'equally guilty' of that crime." (*People v. Lopez, supra*, 198 Cal.App.4th at p. 1118.) Alternatively stated, if a person aids and abets another's commission of first degree murder, that aider and abettor is generally guilty to the same degree as the direct perpetrator (i.e., first degree murder). That principle logically follows from CALCRIM No. 401, which sets forth the mens rea requirement for aiding and abetting, stating in pertinent part: "Before or during the commission of the crime, the defendant *intended* to aid and abet the perpetrator in committing the crime . . . [and] [¶] . . . [¶] . . . knows of the perpetrator's unlawful

12

purpose and he or she *specifically intends* to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."  (Italics added.)

Because the court's reply to Note 1 specifically referred the jury to CALCRIM No. 401 (and No. 400), that standard instruction must be read together with the court's additional instruction that "[i]f you believe that the elements of aiding and abetting have been proven, Senior is guilty to the same degree as Junior."  Therefore, when read as a whole, the court's instructions replying to Note 1 informed the jury that Senior is guilty of the same degree offense as Junior *if* Senior aided and abetted Junior's commission of that degree of offense, which necessarily would require a finding Senior specifically intended to aid and abet Junior's commission of that degree of offense.  If the jury were to find Junior guilty of first degree murder and then found Senior aided and abetted Junior's commission of that offense by applying the court's instructions on aiding and abetting (e.g., which included the requirement of the specific intent to aid and abet), then the jury must also find Senior guilty of first degree murder.  The court's instructions were correct general statements of the law on aiding and abetting.[8]

---

[8]     It may have been preferable for the trial court to avoid any possible misinterpretation of its instructions by specifically instructing the jury that an aider and abettor may be guilty of an offense greater than, equal to, or lesser than the offense committed by the direct perpetrator depending on the intent or other mental state of the aider and abettor.  (See, e.g., *McCoy*, *supra*, 25 Cal.4th at pp. 1117-1122; *Samaniego*, *supra*, 172 Cal.App.4th at p. 1164; *People v. Nero*, *supra*, 181 Cal.App.4th at pp. 507, 513-518; *People v. Lopez*, *supra*, 198 Cal.App.4th at p. 1118.)  To the extent Senior requested the court to instead instruct the jury that if it found he aided and abetted Junior, it could find him guilty of a lesser degree of offense, that modification would constitute an improper pinpoint instruction that would favor him by omitting language stating he could also be found guilty of the same or a greater degree of offense as Junior.

13

Nevertheless, to the extent the court's reply to Note 1 could have been misinterpreted by jurors as stating the jury was *required* to find Senior guilty of the same degree of offense as Junior even if Senior lacked the specific intent required to aid and abet that degree of offense, the court's original instructions, along with its subsequent replies to Notes 2 and 3, clarified any ambiguity, prevented a misinterpretation, and properly guided the jury to apply the correct standard for aiding and abetting liability. Notes 2 and 3, quoted above, asked the court whether the defenses of provocation and/or intoxication could apply to Senior if the jury found he aided and abetted Junior's commission of the crime or whether those defenses applied only to the shooter (i.e., direct perpetrator). The court replied to those notes by instructing the jury that the instructions on the defenses of provocation and intoxication applied to both the shooter and an aider and abettor. Therefore, the court, in effect, instructed the jury that the defenses of provocation and/or intoxication may be available to an aider and abettor (e.g., Senior) regardless of whether it found the direct perpetrator (e.g., Junior) had those defenses. Contrary to Senior's assertion, those instructions did *not* suggest to the jury that the defenses of provocation and intoxication applied only to both defendants or neither defendant and therefore could not apply to one defendant and not the other. By properly instructing the jury that the defenses of provocation and intoxication were available to Senior if he aided and abetted Junior, the court prevented any misinterpretation of the instructions by the jury that would have led it to believe Senior could not assert those defenses to potentially be found guilty of a lesser degree of offense than Junior. Reading

14

the trial court's instructions as a whole, we conclude the jury was correctly instructed on aiding and abetting.

Assuming arguendo the trial court erred by replying to Note 1 and instructing the jury that if Senior aided and abetted Junior, he must be found guilty of the same degree of offense, we nevertheless would conclude that error was harmless even under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24. (Cf. *Samaniego*, *supra*, 172 Cal.App.4th at p. 1165 [applying *Chapman* harmless error standard].) To the extent that instruction may have led the jury to believe that if it found Senior aided and abetted Junior, it could not find him guilty of a lesser degree of offense, the court's original instructions, along with its replies to Notes 2 and 3, disabused the jury of that belief, as discussed above. The court properly instructed the jury on aiding and abetting liability with CALCRIM Nos. 400 and 401 and further instructed the jury that the instructions on the defenses of provocation and intoxication applied to Senior if it found he aided and abetted Junior's commission of the crime. Reading the instructions as a whole, the jury knew that to find Senior guilty of first degree murder it had to consider Senior's individual state of mind and conclude he knew about and shared Junior's intent to commit first degree murder (i.e., premeditated and deliberate murder or murder by lying in wait).

Furthermore, the jury in this case clearly did *not* consider the court's reply to Note 1 as a definitive statement that if it found Senior aided and abetted Junior, it was required to find him guilty of the same degree of offense as Junior. Rather, the jury continued thereafter to consider whether Senior had any defenses to the first degree murder charge

15

if he aided and abetted Junior. The jury twice asked the court whether the defenses of provocation and intoxication could apply to Senior if he aided and abetted Junior. If those defenses were available and found to apply to Senior, Senior could not be found guilty of the same degree of offense as Junior (i.e., first degree murder). Therefore, because the court's instructions, when read as a whole, were correct and the jury continued to consider, after the court's reply to Note 1, potential defenses Senior may have if it found he aided and abetted Junior, any error in the court's reply to Note 1 was harmless beyond a reasonable doubt. It is not reasonably possible the jury used the court's reply to Note 1 to find Senior guilty of first degree murder solely because he assisted Junior and without also finding Senior had the requisite mental state for aiding and abetting Junior's first degree murder. (*Chapman v. California, supra*, 386 U.S. at p. 24; cf. *Samaniego, supra*, 172 Cal.App.4th at pp. 1165-1166 [concluded aiding and abetting instructional error was harmless under *Chapman* standard].)

None of the cases cited by Senior are apposite to this case or otherwise persuade us to reach a contrary conclusion. *People v. Nero*, *supra*, 181 Cal.App.4th 504, cited by Senior, involved both different instructions and different questions by the jury. In *Nero*, the court gave a prior version of instructions on aiding and abetting (i.e., CALJIC No. 3.00), stating in part that "[e]ach principal, regardless of the extent or manner of participation, is equally guilty." (*Nero,* at p. 510.) During deliberations, the jury asked questions reflecting confusion whether an aider and abettor could have a less culpable state of mind than the direct perpetrator. (*Id*. at pp. 507, 509-513.) The jury asked

16

whether an aider and abettor could bear less criminal responsibility than the direct perpetrator. (*Id*. at p. 511.) In reply, the trial court reread the original instructions on aiding and abetting, including the language quoted above using the words "equally guilty." (*Id*. at p. 512.) *Nero* concluded the trial court prejudicially misinstructed the jury by twice rereading CALJIC No. 3.00 in response to the jury's questions. (*Id*. at pp. 518-520.) Because the trial court in this case instructed on aiding and abetting using the current version of CALCRIM Nos. 400 and 401 and the jury did not ask whether it could find an aider and abettor guilty of a lesser degree of offense than the direct perpetrator, *Nero* is inapposite to this case.

## II

### *Prosecutorial Misconduct*

Senior contends the prosecutor committed prejudicial misconduct during closing argument by stating his counsel lied and arguing the jury should not be hoodwinked by his counsel.

### A

In closing argument, Senior's counsel argued in part the law required that "the prosecution's case has to be constructed piece by piece of individual facts, and each of those individual facts have to be proven beyond a reasonable doubt. That is their burden." His counsel further argued that "you can only reach the ultimate conclusion if all the facts supporting that ultimate conclusion of guilt . . . is supported by facts that have been proven beyond a reasonable doubt."

17

Regarding the prosecution's evidence showing Senior aided and abetted Junior in killing Garcia, his counsel argued: "So we're left to rely on Alberto Rivera as to whether or not my client was aiding and abetting in this crime." He further argued Rivera's testimony was "the only evidence we have of actions that [Senior] might have taken before or during the commission of the crime that would aid or abet the perpetrator." He argued there may have been more facts showing Senior aided and abetted the crime, "but we didn't hear them."

In rebuttal, the prosecutor argued:

> "We just heard [Senior's counsel] talk quite a bit about the concept of aiding and abetting. And [he] gets up here and says that the prosecution is exclusively relying on Alberto Rivera, the foreman who was there who saw what happened that night, that we are apparently relying exclusively on Alberto Rivera to establish the theory that [Senior] aided and abetted in the commission of a crime, and that, ladies and gentlemen, is a *lie*. We are not relying exclusively on the testimony of Alberto Rivera for that or for anything else for that matter. We are relying on the totality of the evidence that has been presented on this case, on the whole of the evidence that has been presented in this case.
>
> "And on that note, [Senior's counsel] got up here and said to you that the prosecution is required to prove each and every fact that is alleged in a case, and that's not true either. That's a *lie*. The truth is that the prosecution is required to prove the allegation beyond a reasonable doubt. And the allegation, ladies and gentlemen, is different from each and every fact that you hear about in this case. The allegation in this case is essentially the charge in this case, and the charge in this case is first-degree murder." (Italics added.)

The prosecutor later argued: "[Senior] clearly wasn't so drunk that he didn't know what he was doing. [¶] He didn't even know what he was doing when he arrived at the field that night is essentially what [Senior's counsel] got up here and eloquently suggested to you,

18

couching it in those legal terms, that legal jargon, that defense is trying to *hoodwink* you into believing that that's the truth. Don't fall for the *head fake*." (Italics added.) After challenging Senior's imperfect self-defense claim, the prosecutor argued: "So what's left? *Excuses*. That's all that's left in this case for them is a whole bunch of *excuses*. The defense throws up a series of *excuses*, they fling them up against the wall, and they hope that maybe one of those *excuses* is going to stick." (Italics added.) Continuing on that theme, the prosecutor argued: "What's interesting about these *excuses* is that they really don't care if you believe them or not. They don't care. They just want to throw them all up there and hope that these *excuses* make you start doubting yourself, doubting your thought process, doubting your conclusions so that they're able to create reasonable doubt." (Italics added.)

During the next recess, out of the jury's presence Senior's counsel objected to the above arguments by the prosecutor. His counsel argued the prosecutor asserted he (Senior's counsel) was lying and trying to "hoodwink," or trick, the jury. The trial court initially found Senior's objections were waived as not timely made. In any event, the court concluded the prosecutor's arguments did not accuse the defense of lying to the jury or call Senior's counsel a liar. Rather, the court believed the thrust of the prosecutor's arguments was that the arguments of Senior's counsel were incorrect. Likewise, the court concluded the prosecutor's use of the term "hoodwinked" was "just . . . a strenuous argument advising the jury that the defense is unfounded. And I don't view it as

19

equivalent of calling counsel a name or impugning the integrity of the defense."
Accordingly, the court overruled Senior's objections.

B

Under federal constitutional law, "[i]mproper remarks by a prosecutor can ' "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] Under state law, a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair." (*People v. Frye* (1998) 18 Cal.4th 894, 969.) "[A]s a general rule, to preserve a claim of prosecutorial misconduct, the defense must make a timely objection and request an admonition to cure any harm." (*Ibid*.)

" 'It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567, quoting *People v. Sassounian* (1986) 182 Cal.App.3d 361, 396.) "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets warranted by the evidence.' " (*People v. Fosselman* (1983) 33 Cal.3d 572, 580.) Nevertheless, "[c]asting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom." (*People v. Thompson* (1988) 45 Cal.3d 86, 112.)

20

"Personal attacks on opposing counsel are improper and irrelevant to the issues." (*People v. Sandoval* (1992) 4 Cal.4th 155, 184.) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of-comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye*, *supra*, 18 Cal.4th at p. 970.)

C

Assuming arguendo Senior timely objected to the purported misconduct and requested curative admonitions or did not otherwise waive his objections, we conclude that in the circumstances of this case the prosecutor did not commit misconduct under either the state or federal standard. Contrary to Senior's assertion, in the context of the prosecutor's closing arguments his use of the word "lie" in the two instances quoted above should be construed, and likely was construed by the jury, as challenging the validity or accuracy of certain arguments made by Senior's counsel and *not* as impugning the character of Senior's counsel. First, the prosecutor properly rebutted the argument by Senior's counsel that Rivera's testimony was the *only* evidence of Senior's aiding and abetting the crime. Although the prosecutor could have, and probably should have, made a more appropriate choice of wording, his use of the word "lie" in the context of his argument had the effect of conveying to the jury that it was false or incorrect that the only evidence of Senior's aiding and abetting was Rivera's testimony. In the circumstances of

21

this case, we cannot conclude the jury inferred from the prosecutor's argument that he was asserting Senior's counsel was a liar or otherwise impugning his character. Likewise, in the second instance, the prosecutor properly used the word "lie" in arguing the invalidity or inaccuracy of Senior's counsel's argument that the prosecutor had the burden to prove each and every factual allegation he made. The prosecutor properly argued "[t]he truth is that the prosecution is required to prove the allegation [of first degree murder] beyond a reasonable doubt" and not "each and every fact that you hear about in this case."

In the circumstances of this case, we cannot conclude the jury inferred from the prosecutor's argument, including his use of the word "lie," that he was asserting Senior's counsel was a liar or otherwise impugning his character. Accordingly, we cannot conclude the prosecutor's use of the word "lie" in those two instances was misconduct. Although the prosecutor should have used more appropriate language, the record as a whole shows he used hyperbole and/or epithets as an advocate to convey to the jury that certain arguments made by Senior's counsel were incorrect and not to improperly cast aspersions on his character. (*People v. Wharton*, *supra*, 53 Cal.3d at p. 567; *People v. Fosselman*, *supra*, 33 Cal.3d at p. 580; *People v. Thompson*, *supra*, 45 Cal.3d at p. 112; *People v. Sandoval*, *supra*, 4 Cal.4th at p. 184; cf. *People v. Poggi* (1988) 45 Cal.3d 306, 340 ["the [prosecutor's] comment would have been recognized by the jurors as an advocate's hyperbole and would accordingly have been discounted"].)

Senior also asserts the prosecutor committed misconduct by using the words "hoodwink" and "excuses" as quoted above. However, in the context of the prosecutor's argument, he properly used the word "hoodwink" in rebutting the argument by Senior's counsel that Senior was too intoxicated to know what he was doing prior to and at the time of the killing. By using the term "hoodwink," the prosecutor properly argued to the jury that it should not be persuaded by Senior's intoxication defense.[9] Similarly, the prosecutor properly argued the jury should not be persuaded by the "excuses" for Senior's conduct asserted by counsel to find a reasonable doubt about Senior's guilt. In so doing, the prosecutor in effect argued the evidence did not support those proffered defenses, but instead supported Senior's guilt of the charged offenses beyond a reasonable doubt. Contrary to Senior's assertion, we conclude the prosecutor's argument did *not* in effect argue Senior's counsel did not believe in his client's defenses or was dishonest in presenting those defenses. (Cf. *People v. Thompson*, *supra*, 45 Cal.3d at p. 112; *People v. Bell* (1989) 49 Cal.3d 502, 538.) We conclude the prosecutor's use of the words "hoodwink" and "excuses" in the circumstances of this case did not cast aspersions on the character of Senior's counsel or otherwise constitute misconduct. (*People v. Wharton*, *supra*, 53 Cal.3d at p. 567; *People v. Fosselman*, *supra*, 33 Cal.3d at p. 580; *People v. Thompson*, at p. 112; *People v. Sandoval*, *supra*, 4 Cal.4th at p. 184; *People v. Poggi*, *supra*, 45 Cal.3d at p. 340.) Therefore, we conclude none of the prosecutor's closing

---

9    We reach the same conclusion regarding the prosecutor's use of the term "head fake" in arguing the jury should not be persuaded by Senior's intoxication defense.

23

arguments cited by Senior constituted deceptive or reprehensible methods under federal or state standards for prosecutorial misconduct. (*People v. Frye*, *supra*, 18 Cal.4th at p. 969.)

### III

### *Jury Instructions on Voluntary Intoxication*

Senior contends the trial court erred by not instructing sua sponte on voluntary intoxication regarding the two criminal threat counts (i.e., counts 3 and 4). He argues that because the court instructed on voluntary intoxication as a potential defense to the first degree murder count (i.e., count 1), it was required to give the same instruction regarding the criminal threat counts even without a request by Senior's counsel. Although Senior concedes a trial court is generally not required to give a pinpoint instruction on a voluntary intoxication defense absent a request by counsel (see, e.g., *People v. Saille* (1991) 54 Cal.3d 1103, 1119), he argues that in the circumstances of this case the court had a sua sponte duty to instruct on voluntary intoxication as a defense to the criminal threat counts to "ensure [its] instructions were complete."

A trial court does not have a sua sponte duty to instruct on voluntary intoxication regarding a certain count if it so instructs regarding another count. Although Senior cited *People v. Castillo* (1997) 16 Cal.4th 1009 as support for his argument, it is inapposite to this case and does not persuade us the court erred in these circumstances. In *Castillo*, the California Supreme Court noted that a trial court has a duty to give legally correct instructions when it instructs on a particular issue (e.g., voluntary intoxication defense)

24

and must not give partial instructions on an issue that could mislead a jury. (*Id*. at p. 1015.) Although the trial court instructed the jury that voluntary intoxication could affect the specific intent or mental state required for murder and attempted murder, *Castillo* concluded the trial court's failure to specifically instruct that voluntary intoxication could also affect the defendant's premeditation was not a failure to give complete and correct instructions because the court's instructions as a whole discussed premeditation, deliberation, and intent to kill. (*Id*. at p. 1016.)

The trial court in this case did not incompletely or partially instruct the jury on the defense of voluntary intoxication. Rather, it completely and correctly instructed on that defense, but did so only regarding count 1 and not counts 3 and 4. However, the court's failure to instruct on voluntary intoxication regarding counts 3 and 4 did not result in incorrect or incomplete instructions. The jury was correctly instructed on counts 3 and 4. The trial court did not have a sua sponte duty to instruct on voluntary intoxication regarding counts 3 and 4. Therefore, the court did not err by not instructing sua sponte on voluntary intoxication as a defense to counts 3 and 4. If Senior wanted an instruction on voluntary intoxication regarding those counts, he should have requested one. (*People v. Saille*, *supra*, 54 Cal.3d at p. 1119.)

Because Senior did not request an instruction on voluntary intoxication as a defense to counts 3 and 4, he waived or forfeited any error based on the failure of the trial court to so instruct. (*People v. Freeman* (1994) 8 Cal.4th 450, 495.) Given the waiver or forfeiture, Senior alternatively asserts he was denied his constitutional right to effective

25

assistance of counsel based on his counsel's failure to request a voluntary intoxication instruction regarding counts 3 and 4. However, assuming arguendo Senior's counsel did not have, or could not have had, a tactical reason for, and performed deficiently by, failing to request an instruction on voluntary intoxication regarding counts 3 and 4, we nevertheless conclude he was not denied effective assistance of counsel because such deficient performance was not prejudicial to him. (*Strickland v. Washington* (1984) 466 U.S. 668, 693-694, 697.) Because the jury clearly rejected Senior's defense of voluntary intoxication to count 1 by finding him guilty of first degree murder, it is highly likely the jury likewise would have rejected that same defense to counts 3 and 4 (the criminal threat charges) had the jury been specifically instructed on that defense to those counts. It is not reasonably probable Senior would have obtained a more favorable outcome at trial had his counsel's performance not been deficient as he asserts (i.e., had his counsel requested a voluntary intoxication instruction regarding counts 3 and 4). Therefore, Senior was not denied effective assistance of counsel. (*Ibid.*)

*JUNIOR'S APPEAL*

IV

*Wende Brief*

Junior's appointed appellate counsel has filed a brief summarizing the facts and proceedings below. His counsel presents no argument for reversal, but asks us to review the record for error as mandated by *Wende*, *supra*, 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738. His counsel mentions as possible, but not arguable,

26

issues: (1) whether the trial court erred by admitting certain medical expert testimony (i.e., that one of Garcia's gunshot wounds was close-range and would be considered "execution style"); (2) whether the prosecutor committed misconduct during closing arguments; and (3) whether the trial court erred by denying his posttrial *Marsden*[10] motion for substituted counsel to represent him at his sentencing hearing.

We granted Junior permission to file a brief on his own behalf. He has not responded. A review of the record pursuant to *Wende*, *supra*, 25 Cal.3d 436 and *Anders v. California*, *supra*, 386 U.S. 738 has disclosed no reasonably arguable appellate issues. Junior has been competently represented by counsel on this appeal.

### DISPOSITION

The judgments are affirmed.

McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McINTYRE, J.

---

[10] *People v. Marsden* (1970) 2 Cal.3d 118.